AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Texas

United States Courts
Southern District of Texas
FILED
November 21, 2022
Nathan Ochsner, Clerk of Court

**Sealed**
Public and unofficial staff access to this instrument are prohibited by court order

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| EDGARDO MARTINEZ-RODRIGUEZ | ) | Case No. 4:22-mj-2707 |
| a/k/a "Largo" | ) | |
| Defendant(s) | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of **April 1, 2018 through June 30, 2018** in the county of **Harris** in the **Southern** District of **Texas**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18 United States Code Section 1959(a)(5) | Conspiracy to Commit Murder in Aid of Racketerring |

This criminal complaint is based on these facts:
See attached affidavit in support of criminal complaint and arrest warrant.

☑ Continued on the attached sheet.

Complainant's signature

Ricardo Guzman, FBI TFO
Printed name and title

Sworn to before me by telephone.

Date: November 21, 2022

Judge's signature

City and state: Houston, TX

Yvonne Y. Ho, U.S. Magistrate Judge
Printed name and title

Sealed
Public and unofficial staff access to this instrument are prohibited by court order

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **UNDER SEAL** |
| | ) | |
| v. | ) | CRIMINAL NO. |
| | ) | |
| EDGARDO MARTINEZ-RODRIGUEZ, | ) | **4:22-mj-2707** |
| a/k/a "Largo" | ) | |

**AFFIDAVIT IN SUPPORT OF**
**A CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Ricardo Guzman, being duly sworn, depose and state as follows:

**INTRODUCTION**

1. I am a Sergeant with the Houston Police Department ("HPD") and have been employed by HPD as a Texas Peace Officer since June of 2009. In my current assignment within HPD's Gang Division, I am assigned as a Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI"), Houston Division's Safe Streets Task Force, and have been since October of 2014. As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws of the United States and duly authorized by the Attorney General to request a search warrant.

2. During my career with HPD, I have been assigned as: (1) a uniformed patrol officer; (2) to a uniformed and plainclothes street level gang unit that was tasked with identifying gang members, investigating gang related crimes, and developing sources within gangs to gather intelligence; and (3) to HPD's Major Offenders Division – Career Criminal squad, which investigated serial offenders and other criminal groups/organizations. Throughout this time, I have conducted and participated in thousands of arrests involving gang members and serial offenders,

1

resulting in thwarting their criminal enterprises. In addition, I have testified as an expert witness for the prosecution on matters involving the transnational criminal organization known as *La Mara Salvatrucha*, or more commonly known as MS-13 (hereinafter, "MS-13"). I am familiar with investigative techniques regarding cellphones and other technology, and the use of such technology to commit federal crimes, and have experience executing search warrants, including warrants for cellphone data.

3. I am currently one of several agents who have been assigned to a long term, multi-agency investigation led by the HPD, FBI, and the U.S. Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), regarding a series of crimes committed by members and/or associates of the criminal organization "MS-13," operating in the Southern District of Texas ("SDTX") and elsewhere.

4. In addition to MS-13 members and associates in the SDTX, the investigation has centered around MS-13 members in El Salvador who manage the membership and criminal activity of the gang in the United States, such as EDGARDO MARTINEZ-RODRIGUEZ (a/k/a "Largo") (hereinafter, "defendant" or "LARGO"). LARGO has been identified as a senior level manager of the criminal enterprise based in El Salvador who would contact members and associates in the United States to discuss gang business. LARGO was then responsible for relaying messages to his superiors and passing along orders to those below him.

5. Investigators have determined that LARGO along with the following individuals, Julio Vigil-Lopez a/k/a Hades ("Vigil-Lopez"), Luis Ernesto Carbajal-Peraza, a/k/a Destino, a/k/a Chele ("Carbajal-Peraza"), Carlos Garcia-Gongora, a/k/a Garcia, a/k/a Lil Maligno ("Garcia-Gongora"), Jairo Salvador Licona-Cardenas, a/k/a "Gato" ("Licona-Cardenas"), Christian Rene

2

Chavez-Chavez, a/k/a Pantera ("Chavez-Chavez"), Wilson Jay Ventura-Mejia, a/k/a Discreto, a/k/a Yankee ("Ventura-Mejia"), Anderson Ernesto Ventura-Mejia, a/k/a Maleficio ("Ventura"), and Wilman Rivas-Guido, a/k/a Inquieto ("Rivas-Guido"), were members and associates of MS-13, an organization engaged in, among other crimes, acts involving murder and witness tampering in the SDTX and elsewhere. MS-13, including its leadership, membership, and associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated-in-fact, which engaged in, and the activities of which affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

6. At all times relevant, MS-13 through its members and associates engaged in racketeering activity as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), that is acts involving murder under Texas Penal Code, §§ 19.02, 7.01, 7.02, 15.01 and 15.02.

## PURPOSE OF THIS AFFIDAVIT

7. I am submitting this affidavit in support of a criminal complaint and arrest warrant charging LARGO with Conspiracy to Commit Murder in Aid of Racketeering, in violation of Title 18, United States Code, Section 1959(a)(5).

8. The facts set forth in this affidavit are based upon my personal observations, my training and experience, information obtained from other agents and witnesses, evidence obtained from search warrants, authorized wire and electronic interceptions in this investigation, interviews, records, and other sources, as detailed further below. This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint and arrest warrant and does not purport to set forth all of my knowledge of the investigation into this matter. Unless specifically

indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## PROBABLE CAUSE

## BACKGROUND INFORMATION ON MS-13

9. Based on information provided through, among other means, the debriefing of cooperating witnesses and confidential informants in this and other MS-13 investigations, and speaking with other law enforcement agents, I am aware of the following facts, among others, about MS-13.

10. MS-13 is a violent international street gang involved in a variety of violent criminal activities operating throughout the United States. The gang's membership is composed largely of individuals of Salvadoran and Central American descent.

11. MS-13 originated in Los Angeles, California, in the 1980s. Over time, MS-13 members expanded the gang's presence to El Salvador, where the gang flourished, and across Central America and Mexico. MS-13 also spread throughout the United States, particularly in areas with sizeable Central American populations, including parts of Texas, North Carolina, Virginia, Maryland, New Jersey, New York, Massachusetts, and Tennessee.

12. MS-13's national and international leadership is concentrated primarily in California and El Salvador. Many of these high-ranking MS-13 members are incarcerated and participate in the gang's affairs by using contraband cellular telephones.

13. MS-13 recruits members and associates predominantly from the Hispanic community, typically juveniles. Within MS-13, the primary unit of organization is known as a "clique," which typically includes 10 to 100 members and operates in a specific geographic location.

Each clique is run by the senior leader, who is designated the "First Word," and the second-in-command, who is designated the "Second Word." The other members and associates of the clique take their orders from the "First Word" or "Second Word." The leaders of the respective cliques attend larger general meetings to manage gang operations on a regional and international level. Cliques operate under the umbrella rules of MS-13 and often work together cooperatively to engage in criminal activity and to assist one another in avoiding detection by law enforcement. In the Southern District of Texas ("SDTX") and the surrounding area, these cliques include, among others, Pinos Locos Salvatrucha ("PLS"), Sailors Locos Salvatrucha ("Sailors"), Directos Locotes Salvatrucha ("DLS"), Familia Criminales Locotes Salvatrucha ("FCLS"), and Cabanas Locotes Salvatrucha ("CLS").

14. Sometimes, MS-13 cliques within a particular geographical area are grouped together into a regional organization known as a "program." For example, numerous MS-13 cliques located on the East Coast of the United States are part of the "East Coast Program."

15. Individuals who associate and commit crimes with the gang are called "paisas," "paros," or "observaciones." Individuals who are attempting to join the gang are called "chequeos" or "cheqs." Chequeos undergo a probationary period during which they are required to commit crimes on behalf of MS-13 to achieve trust and prove their loyalty to the gang. To join MS-13 and become full members or "homeboys," prospective members are required to complete an initiation process, often referred to as being "jumped in" or "beat in" to the gang. During that initiation, other members of MS-13 will beat the new member, usually until a gang member is finished counting aloud to the number thirteen, representing the "13" in MS-13.

16. MS-13 members meet regularly to discuss gang activity. At these meetings,

sometimes referred to as "misas," "masses," or "church," members of a clique discuss their recent criminal activities and plan future violent acts. The First Word and/or their deputies preside over the meetings, lead discussions, and issue orders.MS-13 cliques fund their activities in part through the payment of dues by their members. Under this scheme, MS-13 members are required to make these regular payments to their respective cliques. A portion of this money is typically sent back to gang leaders in California or El Salvador, or to leaders of a program. The remainder of the money is typically used to purchase firearms and other weapons for use in violent acts, to purchase drugs for redistribution, to support incarcerated gang members, or to finance other gang-related activity. MS-13 considers failure to make timely dues payments to be a violation of gang rules, generally punishable by a beating.

17.     To promote their gang identity, MS-13 members and associates often wear blue or white clothing, as well as clothing displaying the number "13." MS-13 members and associates also often have tattoos reading "Mara Salvatrucha," "MS," or "MS-13," and mark their territory with graffiti displaying the names and symbols associated with the gang. One such symbol is the MS-13 hand sign, meant to resemble both an inverted "M" and the face of the devil, with outstretched fingers representing the devil's horns. Some MS-13 members have chosen not to have tattoos or to have them placed on areas where they can be easily covered, such as the hairline, in order to conceal their gang affiliation from law enforcement.

18.     MS-13 members are required to follow various rules and MS-13 recruits are indoctrinated into these rules, which are ruthlessly enforced. In most cases, gang members who violate the rules are punished with a beating, a practice commonly referred to as "corte" or "calenton."

19. One of MS-13's primary goals is to destroy its rival gangs, which vary depending on location, but generally include the 18th Street Gang, Brown Pride, and the Latin Kings. Gang rules require that MS-13 members confront, fight, and/or kill rival gang members when possible. MS-13 members sometimes refer to rival gang members using derogatory names, including "chavalas."

20. Cooperation with law enforcement is strictly prohibited under MS-13's rules. It is well understood within the gang that anyone who assists the authorities will be punished with death, and that the gang honors those who have killed police informants.

21. When a disloyal and/or disobedient gang member is ordered to be killed, he is said to be "green lighted." Obtaining a "green light" typically requires the authorization of a clique leader and, in some cases, approval from gang leaders in California or El Salvador.

22. When preparing to kill disloyal and/or disobedient gang members, MS-13 cliques often assign gang members to follow, or "watch," the targeted individuals to learn their patterns and movements, enabling the gang to carry out the murders at opportune times, without alerting law enforcement.

23. In order to protect the power, reputation, and territory of MS-13, members and associates are required to use violence, threats of violence, and intimidation. These acts of violence often include murder and assault with deadly weapons, including machetes. MS-13 members and associates maintain and enhance their status in the gang by participating in such violent acts.

## PURPOSES OF THE MS-13 ENTERPRISE

24. The purposes of the MS-13 enterprise include the following:

   (a) Preserving, expanding, and protecting the power, territory, and reputation of MS-13 through the use of violence, threats of violence, and intimidation;

   (b) Promoting and enhancing MS-13 and the activities of its members and associates by committing crimes, including but not limited to, murder;

7

    (c)    Keeping victims, potential victims, and community members in fear of MS-13 and its members and associates through violence, threats of violence, and intimidation;

    (d)    Confronting and retaliating against rival gangs through the use of violence, threats of violence, and intimidation;

    (e)    Ensuring discipline within the enterprise and compliance with the enterprise's rules by members and associates through threats of violence and acts of violence;

    (f)    Enriching the members and associates of the enterprise through criminal activity, including robbery, extortion, and narcotics trafficking;

    (g)    Hindering and obstructing efforts of law enforcement to identify, apprehend, and successfully prosecute offending gang members; and

    (h)    Providing financial support and information to MS-13 members, including those incarcerated in the United States and El Salvador.

## **METHODS AND MEANS OF THE MS-13 ENTERPRISE**

25.    Among the means and methods by which MS-13 members and associates conduct and participate in the conduct of the affairs of the enterprise are the following:

    (a)    MS-13 members and associates use violence, threats of violence, and intimidation, including acts involving murder, robbery, and assault, to preserve, protect, and expand the enterprise's territory and criminal operations and to enhance its prestige, reputation, and position in the community;

    (b)    MS-13 members and associates promote a climate of fear through violence, threats of violence, and intimidation, including against members of rival gangs;

    (c)    MS-13 members and associates use violence, threats of violence, and intimidation to discipline and punish members and associates who violate enterprise rules;

    (d)    MS-13 members and associates use telephones and social media to discuss gang-related business and to obtain approval for the use of violence to further the purposes of MS-13;

(e)     MS-13 members and associates use, attempt to use, and conspire to use robbery, extortion, and narcotics trafficking as a mechanism to obtain money;

(f)     MS-13 members and associates collect dues to send to MS-13 members incarcerated in the United States and El Salvador and to MS-13 leadership in El Salvador, in an effort to provide financial support to the enterprise; and

(g)     Members and associates of the enterprise hide, misrepresent, conceal, and cause to be hidden the objectives of acts done in furtherance of the enterprise, and use coded language and other means of communication to avoid detection and apprehension by law enforcement authorities.

## THE VICAR MURDER CONSPIRACY

26.     Beginning on a date unknown and continuing through on or about the date of April 29, 2018, in the Southern District of Texas and elsewhere, the defendant, LARGO, and others known and unknown, including Vigil-Lopez, Carbajal-Peraza, Garcia-Gongora, Ventura-Mejia, Ventura, Licona-Cardenas, and Rivas-Guido, for the purpose of gaining entrance to, and maintaining and increasing position in, MS-13, an enterprise engaged in racketeering activity, did intentionally and knowingly conspire to murder Nayeli Guzman, in violation of Texas Penal Code, §§ 19.02 and 15.02, all in violation of Title 18, United States Code, Section 1959(a)(5).

## SUMMARY OF THE INVESTIGATION

## BACKGROUD INFORMATION

27.     On May 4, 2018, an individual who is known to law enforcement but will remain unnamed herein for safety purposes, but referred to herein as "WITNESS A," reported to Houston Police Department ("HPD") that his/her 14-year-old daughter, Nayeli Guzman ("Guzman"), was missing in Houston, Texas. WITNESS A explained that his/her daughter ran away from home two days prior (on May 2, 2018) and had not returned.

28. On or about June 8, 2018, HSI Special Agents in New York listened to lawfully intercepted phone calls monitored in San Salvador, El Salvador ("El Sal Wire Center"). The calls were between the MS-13 members in El Salvador – LARGO and Vigil-Lopez – and Carbajal-Peraza in Houston, Texas. In one call to Vigil-Lopez, Carbajal-Peraza described a murder and also sent pictures of the murder to MS-13 in El Salvador. Based on the nature and context of the calls, LARGO and Vigil-Lopez were determined to be senior level MS-13 managers associated with the PLS clique.

29. On June 14, 2018, other intercepted calls revealed that LARGO planned to transport and deliver firearms in San Salvador, El Salvador. Based on this information, local law enforcement intercepted the vehicles transporting the firearms and LARGO was apprehended. Once in custody, LARGO was positively identified as "Edgar Martinez-Rodriguez," a MS-13 homeboy serving as a "Corredors de Programa" ("program runner") for the PLS clique.

30. Based on the information heard in the intercepted calls, investigators in New York contacted Galveston Police Department ("GPD") to help locate Carbajal-Peraza in Texas. On or about June 26, 2018, HSI agents and GPD detectives used a ping order to track the phone that Carbajal-Peraza used to communicate with El Salvador and were led to an apartment in Galveston, Texas. There, they encountered Carbajal-Peraza, Chavez-Chavez, and others, along with several cellular telephones (phones).

31. Chavez-Chavez stated that two phones belonged to him and provided consent to the agents to inspect the phones. The agents determined that one of the phones Chavez-Chavez claimed was in-fact the tracked phone used by Carbajal-Peraza to speak with LARGO and Vigil-Lopez in El Salvador.

**CELLULAR TELEPHONE EVIDENCE**

32. Subsequently, HSI agents searched the tracked phone previously in Chavez-Chavez's possession pursuant to a lawfully issued search warrant. Upon reviewing the phone's contents, HSI agents discovered a contact for "Pantera" which was known to be a nickname used by Chavez-Chavez. Additionally, agents discovered multiple photographs and videos of Carbajal-Peraza contained on the phone. Agents also observed messages between various MS-13 members including El Salvadorian-based MS-13 leader Vigil-Lopez, Western Union transactions, and other evidence of MS-13 activities in the phone. The phones also contained various photos of obvious murder victims, including images of a female dated April 27-29, 2018. Corresponding with details from intercepted El Salvadoran phone calls, the photos confirm, based on visible rope/cord, that the female victim was strangled.

**GUZMAN BODY FOUND**

33. On August 30, 2018, law enforcement found Guzman's burial site located in a wooded area. Guzman was found wearing the same clothes observed in the April 27-29, 2018 photographs on the phone of Carbajal-Peraza.

34. On August 31, 2018, a medical examiner performed an autopsy on Guzman's recovered remains. The medical examiner determined the manner of death to be homicide with strangulation as the primary cause. The autopsy report noted that the body had several deep cuts all over including to the left eye, neck, back, and legs. Also noted was that one of Guzman's nipples was removed and one of her arms had been severed. Guzman was positively identified by comparative radiography.

## STATEMENT OF CO-CONSPIRATOR VENTURA

35. On August 22, 2018, Ventura was arrested for an unrelated homicide. Following that arrest, Ventura was advised of his *Miranda* rights and agreed to be interviewed. When investigators asked Ventura if he knew anything about Guzman's murder, he laughed and said all he knew was that her name was "Nayeli." Ventura then went on to say that "they" wanted to kill her because she switched over to a rival neighborhood and was "selling them out." Ventura then stated, "Well, I was the one who killed her…. I killed her with a cord. I strangled her."

36. Ventura identified Licona-Cardenas and a "dark-skinned guy," whose name he did not know, as being present at the apartment when Guzman was killed. According to Ventura, Carbajal-Peraza arrived after Guzman was dead. Ventura then admitted that he, Carbajal-Peraza, the "dark-skinned guy," and Licona-Cardenas put Guzman's blanket-wrapped body into the trunk of his (Ventura's) brother's white Honda. He said that the group then took her body to a house on Nelson Street in Texas. Ventura further said that after they arrived at the house, he fell asleep, and therefore, was not present for the burial. However, Ventura told investigators that it was his idea to kill Guzman. Ventura also stated that Carbajal-Peraza told him that they were going to kill her because she was selling them out and wanted to turn them in.

## STATEMENT OF LARGO

37. On May 31, 2022, LARGO was caught attempting to circumvent a U.S. Border Patrol checkpoint near Falfurrias, Texas. Agents detained LARGO and determined that he was a citizen and national of El Salvador, who had been previously removed from the United States in 2011. LARGO was further determined to be without any immigration documents that would allow him to enter or remain in the United States legally. As a result, he was charged with illegally re-entering the United States and later convicted of this offense on August 17, 2022.

38. While in the custody of the Immigration and Customs Enforcement ("ICE") agency in Laredo, Texas, LARGO was interviewed by investigators and prosecutors with the HSI, FBI, ICE, and Department of Justice ("DOJ") on several dates.

39. In particular, on or about November 2, 2022, FBI Task Force Officers conducted an interview with LARGO in Laredo, Texas. Prior to the interview, LARGO was again read his *Miranda* rights and agreed to speak without the presence of a lawyer.

40. During this interview, LARGO discussed the internal structure of MS-13 starting from the top of the organization – which he identified as "La Ranfla," a group of MS-13 members that have the overall control of the organization and the final say-so on any issues brought to them. He then said below La Ranfla were the programs of MS-13 – which were geographically located and made up of multiple cliques – who are overseen by the Program Leaders or "Runners." LARGO then stated at the bottom of the organization you have your cliques, who are made up of multiple MS-13 gang members and controlled by the clique leader.

41. LARGO stated that during the time frame of 2017 continuing through 2018, his specific position within this structure was a Program Leader, who had control over all the PLS cliques within MS-13 and reported directly to members of La Ranfla. LARGO explained that one of the individuals he had reporting directly to him was Hades, who was in El Salvador but in charge of all the U.S. based PLS clique members. LARGO stated that he placed Hades in this position in order to begin rebuilding the PLS cliques in the U.S. Additionally, LARGO stated that he selected Hades for this position because Hades had spent time in the U.S., was smart, and LARGO knew that Hades would need to authorize criminal activities in the U.S., all the way up to approving "hits" (murders/killings). LARGO stated that he did not want to be in the position of authorizing these types

of criminal activities in the U.S. but acknowledged that murders of rivals and those who were in conflict with MS-13 was a necessary and expected outcome of the gang.

### INTERCEPTED CALLS ON APRIL 27 AND APRIL 28, 2018

42. Investigators obtained and reviewed previously intercepted phone calls judicially intercepted by the El Sal Wire Center. The calls contain conversations between LARGO and other members of MS-13 providing reports and obtaining authorizations regarding activities in El Salvador and the United States. On November 15, 2022, investigators identified intercepted calls that detailed plans involving the murder of Guzman by MS-13 members in Houston, Texas. The calls were between MS-13 PLS clique leaders LARGO and Vigil-Lopez in El Salvador.

43. On April 27, 2018, at approximately 10:17 AM (local time El Salvador), a call was intercepted between MS-13 PLS clique leader LARGO at phone number "+503 7674-0252" and a female individual. At approximately one minute and forty seconds into the call, LARGO receives and accepts another call from an individual identified by Salvadoran law enforcement as Vigil-Lopez. During this call Vigil-Lopez asks if LARGO received pictures of the "girls," to which LARGO responds in the affirmative. Vigil-Lopez then asks if LARGO approves of letting the "boys" participate in the murder. LARGO responds in the affirmative but cautions that murder should not attract attention. Vigil-Lopez concurs and affirms the murder will take place in an apartment and that the body will be taken out in a sheet or suitcase.

44. On April 27, 2018, at approximately 12:17 PM (local time El Salvador), a call was intercepted between LARGO at phone number "+503 7674-0252" and Vigil-Lopez at phone number "+503 7265-5938" where they further discuss the planned killings. During this conversation LARGO directs Vigil-Lopez to tell the people in the U.S. to "play," (which based on my training and experience investigating MS-13 investigations, is code for killing) and then requests

information about the girls who are targets of the killings. Vigil-Lopez informs LARGO that they are associating with a known informant and may have information on the location of clandestine graves. Later, at one minute and 46 seconds of the same call, LARGO reaffirms that the "boys" should complete the job but that no one should find out about it. During this portion of the call Vigil-Lopez and LARGO also discuss the possibility of promoting the individuals to take part in the murders.

45. On April 28, 2018, the day after Guzman was murdered, at approximately 10:46 am (local time El Salvador), a call was intercepted between MS-13 PLS clique leader LARGO at phone number +503 7572-1862, and another MS-13 leader identified as Maniatico at phone number +503 7572-1862. During the call Maniatico says that he wanted to report that up there (in the U.S.) they had "played over a person" (killed someone) and that it was executed perfectly. Maniatico also reports that Gato, Alcaran, and Destino participated. LARGO asks Maniatico how many had they gone to (killings) and if it was only one. In response, Maniatico agrees (that it was only one).

46. Upon review of these calls, investigators determined that LARGO discussed and authorized the plan to kill Guzman before it occurred and, after its completion, received confirmation that it had in fact occurred. Investigators also determined from these calls, the interviews of witnesses and participating co-conspirators, as well as other evidence discovered in their investigation, that this murder took place due to MS-13's strict rules prohibiting any perceived cooperation with law enforcement and to facilitate promotion of its members within the structure.

## CONCLUSION

Based on the forgoing information provided in this affidavit, there is probable cause to believe that LARGO committed a violation of Title 18, United States Code, Section 1959(a)(5) (Conspiracy to Commit Murder in Aid of Racketeering).

Ricardo Guzman
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to me by telephone on 21st day of November, 2022 and I find probable cause,

The Honorable Yvonne Y. Ho
United States Magistrate Judge
Southern District of Texas

16